UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| EVANGER'S CAT AND DOG FOOD | ) | |
|---|---|---|
| COMPANY, INC., | ) | |
| | ) | No. 17 C 9229 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| SUSAN THIXTON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Evanger's Cat and Dog Food Company, Inc. brought this suit against Susan Thixton, alleging claims for libel per se, libel per quod, and commercial disparagement. Evanger's also asserts claims under the Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/1 *et seq.*, and Illinois Consumer Fraud and Deceptive Business Practice Act (ICFA), 815 ILCS 505/1 *et seq.* R.1, Compl.[1] The dispute arises from online articles that Thixton published about Evanger's.[2] *Id.* ¶¶ 48-50. Thixton now moves to dismiss the Complaint for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), and failure to adequately state a claim, Fed. R. Civ. P. 12(b)(6). R. 13, Mot. to Dismiss at 1. For the reasons stated below, discovery is needed to determine whether the Court has personal jurisdiction over Thixton. So

---

[1] Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

[2] This Court has diversity jurisdiction over the case under 28 U.S.C. § 1332(a). Evanger's is a citizen of Illinois, Thixton is a citizen of Florida, and the amount in controversy plausibly exceeds $75,000.

Thixton's motion to dismiss for lack of personal jurisdiction is denied, without prejudice, in order to permit jurisdictional discovery and then a later refiling of the motion. The Rule 12(b)(6) aspect of the motion is terminated without prejudice, because the jurisdictional question should be answered first.

## I. Background

For the purposes of this motion, the Court accepts as true the allegations in the Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In addition to the allegations in the pleading, documents attached to a complaint are considered part of the complaint. Fed. R. Civ. P. 10(c). Evanger's alleges that Thixton engaged "in a calculated defamation campaign against Evanger's" by publishing three accusatory articles on Thixton's website, "truthaboutpetfood.com." Compl. ¶ 6.

First, Evanger's states that a June 8, 2017 article written by Thixton, entitled "Waiting on Test Results, Another Possible Pentobarbital Poisoning Incident," incorrectly named Evanger's as the manufacturer of "Wild Calling" cat food. Compl. ¶¶ 10-11. The article stated that the "Wild Calling" cat food, which was being investigated for possible pentobarbital contamination, was "made at Evanger's," even though Evanger's in fact was not the manufacturer. *Id.* ¶¶ 10-11. Although Thixton did later correct the error, Evanger's alleges that the false accusation in the initial publication had already caused damage. *Id.* ¶ 11.

Next, Evanger's describes an October 20, 2017 article by Thixton as defamatory because it "falsely asserted" that Evanger's "lost" its organic certification from Oregon Tilth, an organic-food advocacy organization. Compl. ¶¶ 7, 14. This

article, entitled "Evanger's Pet Food Caught Again," featured an image of Evanger's canned dog food labeled "Certified Organic by Oregon Tilth" with a caption reading, "No … no it's not!" R. 1-2, Compl. Exh. B, "Caught Again" Article. The article asserted that Evanger's continued to present its products as certified organic despite having "lost" its organic certification. *Id.*; Compl. ¶ 14. Thixton ended the article with a question to Evanger's: "when will the lies stop?" Compl. Exh. B, "Caught Again" Article. Evanger's alleges that the "Caught Again" article contained two false statements: (1) Evanger's "lost" the organic certification, when in reality Evanger's voluntarily "surrendered" it; and (2) the can of Evanger's pet food was falsely labeled organic, when in fact at the time that the food was manufactured and labeled, Evanger's still had its organic certification. Compl. ¶¶ 14-18.

Evanger's swiftly responded to the "Caught Again" article by writing a letter to Thixton, demanding that she take down the post. Compl. ¶ 19. Thixton did so, but did not retract the statements from the "Caught Again" article. *Id.* ¶ 20. Instead, Thixton published an article entitled "Not Defamation, Truth" on October 23, 2017. R. 1-3, Compl. Exh. C, "Not Defamation" Article. In "Not Defamation," Thixton responded to the Evanger's letter and defended the content of her "Caught Again" article. *Id.* Citing information from the Oregon Tilth website, Thixton bolstered her earlier suggestion that a voluntary surrender of a certification is not *necessarily* inconsistent with the manufacturer having violated certification standards; according to Thixton, a manufacturer in fact can voluntarily surrender a certification even when it is noncompliant. *Id.* Thixton also speculated about whether Evanger's closed one of

3

its canning facilities due to reported Food and Drug Administration (FDA) violations, such as "peeling paint and mold on walls throughout [the canning] facility." *Id.* Thixton wrapped up the article by declaring that her intent was not to malign any particular pet food company, but rather to share the truth about pet food with consumers. *Id.*

Evanger's asserts that the "Not Defamation" article did not retract the statements made in the "Caught Again" article, but rather "reinforced" the false accusation that Evanger's had lied about its organic certification. Compl. ¶ 25. Evanger's alleges that, in addition to doubling down on Thixton's assertions in the "Caught Again" article, the "Not Defamation" article "intentionally and maliciously" insinuated "that Evanger's operated an unethical and criminal enterprise." *Id.* ¶ 27. Evanger's further alleges that Thixton's claims "were knowingly and recklessly false," as evidenced by the fact that she had to stitch together sources and information in order to present Evanger's in a negative light. *Id.*

## II. Analysis

### A. Personal Jurisdiction

"[A] complaint need not include facts alleging personal jurisdiction." *Purdue Res. Found v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (quoting *Steel Warehouse of Wis., Inc. v. Leach*, 154 F.3d 712, 715 (7th Cir. 1998)) (alteration in original). But the plaintiff bears the burden of establishing that personal jurisdiction is proper when jurisdiction is challenged by the defendant. *Id.* When personal jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(2) and the

4

material facts necessary to decide on the issue are in dispute, the Court must consider allowing jurisdictional discovery and holding an evidentiary hearing to resolve the dispute. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Then, "the plaintiff must establish jurisdiction by a preponderance of the evidence," *Purdue Res. Found.*, 338 F.3d at 782, and "prove what it alleged" at that hearing. *Hyatt Int'l*, 302 F.3d at 713. This is in contrast to what is "[n]ormally [done] on review of a motion to dismiss," where the court "accepts all well-pleaded allegations in the complaint as true." *Id.*

A district court sitting in diversity has personal jurisdiction over a non-resident defendant only if a court in the state where it sits would have jurisdiction. *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 548 (7th Cir. 2004). Further, states can only hale non-resident defendants into court to the extent allowed by due process. *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 108 (1987); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). The Illinois long-arm statute authorizes personal jurisdiction over a non-resident defendant doing business or committing tortious acts within the state. 735 ILCS 5/2-209. It also permits the court to exercise jurisdiction "on any other basis" allowed by the Illinois and federal Constitutions. *Id.* at 5/2-209(c). Essentially, the Illinois long-arm statute asks whether exercising personal jurisdiction would comply with federal constitutional due process under the Fourteenth Amendment. *uBid v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010).

There are two types of personal jurisdiction: general and specific. *Daimler AG v. Bauman*, 571 U.S. 117, 126-27 (2014). General jurisdiction refers to a court's broad ability to hear "any and all" claims against a defendant who is at home in the forum state, whereas specific jurisdiction is the court's ability to adjudicate an "activity or an occurrence" that takes place in the forum state. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). A court has general jurisdiction over an entity when that entity's contacts with the state are sufficiently "continuous and systematic" to warrant exercise of personal jurisdiction for all matters under the Due Process Clause of the Fourteenth Amendment. *Id.* at 919. Because Evanger's is not asserting general jurisdiction over Thixton, only specific personal jurisdiction is at issue. R. 18, Pl.'s Resp. Br. at 2.

**B. Specific Jurisdiction**

To exercise specific jurisdiction over a defendant, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). To test whether the defendant's conduct has created sufficient contact with the forum state, courts have looked to see whether "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) [whether] the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). In addition, haling the defendant into court in the forum

6

state must "not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (cleaned up).[3]

For cases involving intentional tort claims such as this one, "the inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state." *Tamburo*, 601 F.3d at 702. The test for determining whether a defendant has purposefully availed herself of the protections of a forum state's laws has three elements. *Id.* at 703. First, the defendant must have engaged in "intentional conduct (or intentional and allegedly tortious conduct)." *Id.* (cleaned up). Second, the conduct must have been "expressly aimed at the forum state." *Id.* And finally, the defendant must know that the effects of the allegedly intentional and tortious conduct "would be felt—that is, the plaintiff would be injured—in the forum state." *Id.*

**1. Defamation Cases**

In most defamation cases, it is not particularly difficult for a plaintiff to prove the first element of the purposeful-availment test. It is par for the course that a speaker accused of defamation spoke intentionally. The second and third elements are not as easy to apply, especially when the statements at issue are published *online*. The questions are (a) what is needed to find that a statement was "expressly aimed" at the forum state, *Abbott Labs. v. Earnshaw*, 2013 WL 212909, at *3 (N.D. Ill. Jan. 17, 2013) (citing *Tamburo*, 601 F.3d at 704-08); and (b) what are the nature and extent of the "effects" that must be felt in the forum state?

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

On top of the emergence of defamation via online publication, the analysis is also somewhat complicated by the fact that a decades-old Supreme Court decision specifically addressed defamation, *Calder v. Jones*, 465 U.S. 783, 789-90 (1984), but in more recent times, the Supreme Court distinguished *Calder* in non-defamation cases, *Walden v. Fiore*, 571 U.S. 277, 284 (2014). In *Calder*, a California actress brought a defamation suit against a Florida-based newspaper in California state court. 465 U.S. at 784-85. The article was written and edited in Florida, but the Supreme Court held that California could exercise personal jurisdiction over the defendants. *Id.* at 788-89. *Calder* pointed out that the defendants' article "was drawn from California sources, and the brunt of the harm, in terms both of [the plaintiff's] emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 788-89. The article also described the California activities of the California plaintiff. *Id.* at 788. So California was "the focal point both of the story and of the harm suffered," and thus personal jurisdiction was proper "based on the 'effects' of their Florida conduct in California." *Id.* at 789.

More recently, however, the Supreme Court has cautioned lower courts against over-reading and over-emphasizing the "effects" element in *Calder*. In *Walden*, a Georgia police officer seized around $97,000 in cash from a couple at a Georgia airport, purportedly based on a suspicion that the cash comprised illegal proceeds. 571 U.S. at 280. The couple had only stopped at the Georgia airport to catch a connecting flight to their home state of Nevada. *Id.* Several months later, the government returned the cash, and the couple sued the Georgia police officer for

8

unreasonably seizing the money. *Id.* at 281. The suit was brought in the federal district court in Nevada. In rejecting the assertion of personal jurisdiction in Nevada, the Supreme Court held that, standing alone, "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290. The only connection to Nevada was that the *plaintiffs* lived there and the money was delayed in getting back to the *plaintiffs* there—the *defendant* did nothing to connect himself to Nevada. *Id.* at 289. *Walden* carefully distinguished *Calder* based on the *nature* of the intentional tort: publication was a "necessary element" of the defamation claim in *Calder*, so the reputational injury suffered in California, which arose because the article "was read by a large number of California citizens," connected the newspaper to California. *Id.* at 287-88. That California-based injury—combined with the other facts connecting the article to California (the sources for the article and the activities described in the article were in California)—sufficed for personal jurisdiction. *Id.* at 287-88. In contrast, the Georgia police officer's allegedly illegal seizure of the case was complete in Georgia. Even the follow-up conduct (like submitting an affidavit to a prosecutor's office in Georgia) all occurred there. *Id.* at 288-289. So the delay in having the money was felt in Nevada only due to the *plaintiffs*' contact there, not the officer's. In sum, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290.

As this discussion of *Walden* and *Calder* makes plain, *Walden* did not overrule *Calder*, and instead distinguished it. So defamation claims still are governed by

9

*Calder*. But *Walden* did explain and clarify *Calder* and its limits, and specifically held that "mere injury to a forum resident is not a sufficient connection to the forum." *Walden*, 571 U.S. at 290. Even before *Walden*, the Seventh Circuit had drawn that line, requiring "something more beyond injury in the forum state" for personal jurisdiction—even in defamation or reputational harm cases. *uBid*, 623 F.3d at 427 n.1 (cleaned up) (trademark infringement); *Tamburo*, 601 F.3d at 706 (defamation); *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 412 (7th Cir. 1994) (trademark infringement); *see also Telemedicine Sols., LLC v. WoundRight Techs., LLC*, 27 F. Supp. 3d 883, 898 (N.D. Ill. 2014) (trademark infringement).

The Seventh Circuit's decision in another defamation case, *Tamburo v. Dworkin*, also establishes what is relevant to the jurisdictional inquiry. In *Tamburo*, the Illinois-based plaintiff sued multiple individuals for defamation, alleging that the defendants "engaged in a concerted campaign of blast emails and postings on their websites accusing him of stealing their data and urging dog enthusiasts to boycott his products." 601 F.3d at 697. The Seventh Circuit approved the exercise of personal jurisdiction over the out-of-state defendants who encouraged readers to boycott the plaintiff's products; published, in some statements, the plaintiff's Illinois address and urged readers to contact and harass him; and did those things knowing that the plaintiff worked and lived in Illinois. *Id.* at 706. At the same time, *Tamburo* rejected the exercise of personal jurisdiction over an Australian corporation, which had reposted some of the individual defendants' statements on the corporation's private

10

listserv. *Id.* at 707. In explaining its rationale, the Seventh Circuit examined the *quantity* of statements, whether the statements had a *forum-directed impact*, and the company's *knowledge* of whether the plaintiff was based in Illinois: there was no evidence on how many messages were reposted (quantity), whether the messages called for a boycott of the plaintiff's Illinois business (forum-directed impact), or even whether the corporate defendant even knew that the plaintiff was based in Illinois (knowledge). *Id.* So, unlike the contacts of the individual defendants, the corporate defendant's Illinois-related conducts were insufficient to support personal jurisdiction. *Id.*

## 2. Application to Thixton

Applying the principles from *Calder*, *Walden*, and the Seventh Circuit decisions here, the Court concludes that the current record does not sufficiently answer whether personal jurisdiction applies over Thixton here in Illinois. Although the number of articles at issue is known (three), the potential impact in Illinois is not. The record sheds no light on, for instance, the number of relevant readers of the articles in Illinois. To be sure, the articles were published online, so of course they would be accessible to Illinois readers—but that is not enough by itself enough to establish personal jurisdiction. *See Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 446 (7th Cir. 2010) (personal jurisdiction not proven "simply by showing that the defendant maintained a website accessible to … the forum state and alleging that the defendant caused harm through that website."). Evanger's asserts that it lost sales "as a direct and proximate result

of Thixton's defamatory statements," Compl. ¶ 48, but the tort of defamation (as *Calder* notes and as *Walden* further explains) depends on publication to the relevant readers. In this case, the relevant readers are Evanger's distributors, retailers, and individual consumers, so it is important to know where those people and businesses are located, and what proportion of Evanger's sales arises from Illinois versus other states. To understand why those are important facts, consider a defamation case where an Illinois company sells 100% of its goods in a store located in Florida, and all of its customers live in Florida. A Florida resident disparages the goods via online statements, and some of the customers—all Florida residents—stop buying the goods. Even though the company's injury is "felt" in Illinois, in the sense that the company is headquartered there, the location of that injury arises from the *plaintiff*'s connection to Illinois, not the *defendant*'s. On those facts (which are admittedly extreme to illustrate the underlying point), the Florida resident would not be subject to personal jurisdiction in Illinois. Fact-digging is needed here to figure out where are the relevant readers of Thixton's statements.[4]

There is also a gap in the record on whether Thixton even knew that Evanger's was based in Illinois at the time she published the "Wild Calling" and "Caught Again" articles.[5] If Thixton did not know Evanger's location at the time she posted those

---

[4]The Court hastens to add that this holding is *not* intended to require a showing of actual damages on the defamation *per se* claim, either at the jurisdictional-inquiry stage or ever. Actual damages are not required for defamation *per se* claims. Instead, the question for personal-jurisdiction purposes is the location of the relevant readership, not whether in fact the articles caused an actual loss in sales.

[5]The third article (the "Not Defamation" article) explicitly refers to the cities in Illinois in which Evanger's operated its canning facilities.

12

articles, then that would undermine Evanger's argument that personal jurisdiction could apply here in Illinois as to those first two articles. For those two articles, Thixton would be just like the Australian company in *Tamburo*, which did not know that the plaintiff was located in Illinois (or at least the evidence failed to show that knowledge).

### III. Conclusion

To wrap up, discovery is needed before definitively deciding whether Illinois can assert personal jurisdiction over Thixton. The first line of inquiry: what is the extent and proportion of the relevant readership located in Illinois, including distributors, retailers, and customers? Evanger's business model and practices might require refinement of the pertinent discovery, and the parties must confer over the proposed discovery plan. The second question: did Thixton know that Evanger's was located in Illinois when she published the first two articles?. It might be that she would concede that she did, and that concession would cut off the need for further discovery on that point. Again, the parties must confer over the discovery, if any, that would be needed on the knowledge question. The motion to dismiss can be renewed after jurisdictional discovery. For now, it is denied. The merits arguments under Rule 12(b)(6) are terminated without prejudice, because the jurisdictional issue should be decided first.[6]

---

[6]Because a "lack of jurisdiction cannot be deemed harmless error," *Lovelace v. Dall*, 820 F.2d 223, 226 n.3 (7th Cir. 1987), and the personal-jurisdiction question might end up being a very close call in this case (including on appeal, in light of the ongoing development of the law as applied to online defamation), Evanger's should seriously consider whether it makes sense to risk litigating in Illinois.

The status hearing of September 6, 2018 remains as scheduled. The parties shall file a joint status report on the proposed discovery plan by August 31, 2018.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 13, 2018